### COFFIN v. BARBER et al.

(Supreme Court, Appellate Division, Fourth Department. November 14, 1906.)

FRAUD—ACTIONS—LIMITATIONS.

Plaintiff, an attorney, living about 100 miles from the home of a corporation, was induced to purchase certain of its stock by defendant's false representations that the stock was worth $188 a share; that the company was doing a large and prosperous business, had a net surplus of $52,889.44, owned real estate of the value of $100,000, had tools and machinery worth $65,000; and that the total value of its assets was about $287,000. The stock was transferred to the plaintiff in July, 1893, and in the following November a temporary receiver of the corporation was appointed. Shortly thereafter the receivership was made permanent and a verified statement of the assets and liabilities was filed, showing the corporation to be insolvent. The property was sold by the receiver in March, 1894, which sale plaintiff attended. The entire assets of the corporation brought only $99,289.68, and its total indebtedness amounted to $194,637.89. *Held*, that plaintiff was charged with knowledge of the falsity of defendants' representations at least as early as the date of such sale, and that an action to recover damages for the fraud, not brought until 1902, was barred by limitations.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 33, Limitation of Actions, §§ 490–492.]

Kruse, J., dissenting.

Appeal from Equity Term, Onondaga County.

Action by Walter S. Coffin against James J. Barber and another, impleaded with others. From a judgment in favor of plaintiff against defendants Barber and Benson, they appeal. Reversed. New trial ordered.

The action was commenced on the 27th day of August, 1902 to recover the damages sustained by the plaintiff because of the alleged fraud of the appellants, by which he was induced to convey certain woodlands owned by him situate in the town of Fins, St. Lawrence county, and to accept as part of the purchase price thereof certain shares of the capital stock of the Phœnix Foundry & Machine Company, which stock, it is alleged, was practically of no value at the time of such transfer and was known so to be by the appellants.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, NASH, and KRUSE, JJ.

T. E. Hancock, for appellant Barber.
D. P. Morehouse, for appellant Benson.
A. E. Kilby, for respondent.

McLENNAN, P. J.   It seems to me that it is established by the undisputed evidence that plaintiff's alleged cause of action was barred by the statute of limitations before the suit was begun, and therefore that defendants' motion for a nonsuit should have been granted.   It is only necessary to call attention to the facts pertinent to that issue.   The findings of the learned Trial Court upon the other issues are supported by evidence, and we are disposed to regard them as final for the purposes of this review.

In the year 1893 the plaintiff was the owner in fee of a large tract of woodland situate in St. Lawrence county.   It was incumbered by mortgages aggregating about $16,000.   Taxes had been assessed against it which were past due, and judgments had been recovered against the plaintiff which were unpaid.   It is apparent that it was essential for the plaintiff, in order to save his equity in the premises, to find a purchaser for the same; and early in the summer of that year he commenced negotiations with the defendant Barber for the sale of such lands, which finally culminated early in July, 1893, when the plaintiff executed and delivered a deed of the premises to the appellants, and received as part of the purchase price thereof $8,200 par value of the capital stock of the Phœnix Foundry & Machine Company, a domestic corporation engaged in the manufacturing business in the city of Syracuse, N. Y.   There is evidence tending to show that it was represented to the plaintiff by the defendant Barber that the stock was good paying stock; that its actual value was $188 per share; that the company was doing a large and prosperous business and had a net surplus of $52,889.44; that he was shown a statement which indicated that the company owned real estate of the value of $100,000, tools and machinery worth $65,000, and that the value of its total property amounted to about $287,000; that he believed such representations to be true and accepted the stock, relying thereon; that such statements were, in fact, false and were known so to be by the defendants.   Such stock was transferred to the plaintiff in July, 1893, and in November of that year a temporary receiver of the corporation was appointed, and shortly thereafter a permanent receiver was appointed.   The court found:

"The petition for the appointment of the temporary receiver and permanent receiver, respectively, the inventory of the property of the company made by the trustees in such proceedings, and the verified statement of the liabilities of the company and a statement of its stockholders and directors were duly filed in the office of the clerk of Onondaga county all within six months of November, 1893."

The court, also, found:

"The property of the company was sold by the receiver about March, 1894. The plaintiff received notice of such sale and went to Syracuse and attended the sale."

Upon such sale the entire assets of the corporation brought only $99,289.68, and the total indebtedness at that time amounted to $194,-637.89. It also appears that the plaintiff is a lawyer of considerable experience and at all the times in question resided and was engaged in the practice of his profession at Carthage, N. Y., about 100 miles distant from Syracuse, where the corporation was doing business and where its plant and property were located, and that the plaintiff was frequently in Syracuse, and during no part of the time was suffering from any disability, physical or mental. As we have seen, this action was not commenced until the 27th day of August, 1902, nearly nine years after a receiver of the corporation was appointed, all its property sold, and it ceased to do business because insolvent.

We think the facts and circumstances which came to the knowledge of the plaintiff between November, 1893, when the receiver was appointed, and the date of the sale in March, 1894, were such as would lead an ordinarily prudent man to conclude that, if the representations had been made as claimed, he had been imposed upon in July previous, when he took the stock in question. According to his story, he was told that it was worth $188 per share. He knew four months later that it was then worthless. He says he was told in July that the company was doing an extensive and lucrative business, but he knew in November that it had gone into the hands of a receiver. Says he was shown a statement in July to the effect that the real estate of the company was worth $100,000. He knew in March following when it was sold at public auction that it was only worth half that amount, and that in said statement the tools and machinery were stated to be of the value of $65,000, but only brought $15,000. He says he was told in effect by such statement that in July the total property of the corporation was worth $287,032.29, and ascertained in March following that it would only sell for about $99,000, but was told in July that there was a net surplus of $52,889, and learned in November that the company's indebtedness then exceeded the total value of its assets by practically $100,000. It should be borne in mind that the plaintiff is a lawyer who has practiced quite extensively in the state and federal courts. He knew that the proceeding for the appointment of a receiver indicated insolvency; knew that an inventory must follow; knew where all such papers were required to be filed and that they were accessible to him, that he could study and examine them at will. With knowledge of these facts and circumstances for a period of eight years, the plaintiff made no inquiry or investigation to ascertain the cause of the discrepancy in the representations claimed to have been made to him in respect to the financial condition of the corporation in July, 1893, and its actual condition in November following, or at least in March, 1894, when he knew absolutely that the stock which had been represented to him as worth $188 per share was worse than worthless.

Practically the contention of the plaintiff is:

"Notwithstanding I knew all the facts to which attention has been called, not later than March, 1894, I never mistrusted until eight years later that the statement made to me in July that my stock was worth $188 per share, that the company was doing a prosperous business, that it had a net surplus of $52,000, and that its total property was worth $287,000, was false, and really

there was nothing about the whole situation which would put a reasonably prudent man upon his inquiry."

We conclude that such is not the fair meaning of the evidence, and that there is no authority for the proposition that under such circumstances a party may avoid the statute of limitations simply by testifying that he had no actual knowledge of the fraud claimed to have been perpetrated upon him, and therefore failed to make any inquiry or investigation to ascertain the meaning of the facts which did come to his knowledge, all of which were inconsistent with the truthfulness of the representations, the making of which he alleges constituted such fraud. The decision in Higgins v. Crouse, 147 N. Y. 411, 42 N. E. 6, is not authority for respondent's contention. The rule applicable is stated in that case as it has been uniformly understood. At page 416 of 147 N. Y., page 7 of 42 N. E., the court said:

"I think the rule is that, where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him. He will be held, for the purposes of the statute of limitations, to have actually known what he might have known and ought to have known."

The court further said (page 415 of 147 N. Y., page 6 of 42 N. E.) :

"Fraud lies in the intent to deceive, but the mental emotion is inferred from the facts which indicate it, and it is with those facts and the inferences to which they lead that the law necessarily deals. When, therefore, facts are known from which the inference of fraud follows, there is a discovery of the facts constituting the fraud and within the precise terms of the statute. That the defrauded party did not actually draw the inference, but shut his eyes to it, does not stop the running of the statute. He ought to have known, and so is presumed to have known, the fraud perpetrated. But a case may arise where he knows none of the facts, where no circumstance has occurred calculated to arouse his suspicion or disturb his confidence or suggest the need of inquiry. In such a case I think we are bound to say that he owes no duty of diligence to discover a fraud which he has no reason to suspect, and is not negligent for failing to enter upon an investigation which no fact within his knowledge indicates to be necessary or prudent. But still another emergency may arise. Let us suppose that the injured party does not know all the facts, is not aware of enough of them to justify a decided inference of fraud, but does know sufficient to fairly arouse suspicion, to create a probability, to suggest the need of an inquiry. Can a party so situated omit all investigation, remain purposely blind, neglect the duty of inquiry, when reasonable and natural action would reveal the truth and disclose the fraud? I think not. In such a case it seems to me that we are bound to impute to the party the knowledge which he ought to have had and would have had if he had done his duty, and say for the purposes of the statute of limitations that there was in law a discovery of the facts which constitute the fraud. Certainly there was a discovery of some of them, and the party should be charged with a knowledge of the rest when he might and should have known them."

In that case the plaintiff, who resided in the city of Syracuse, complained because, as alleged, by means of false and fraudulent representations made by the defendant, who was his neighbor and business acquaintance and who claimed to be his particular friend, he was induced to purchase from the defendant at par a number of shares of the capital stock of a corporation organized to exploit certain alleged oil territory in the state of Pennsylvania. Plaintiff in that case

testified, in substance, that he was told by the defendant, who was president of the corporation, that its stock was gilt edge, and was selling readily at par; that the company had purchased the "Shaffer Farm" in the oil-producing territory, and that wells were being put down with every prospect of success; that, as matter of fact, the territory at the time had been fully tested and no oil was found; that no wells were being put down, practically that the attempt to find oil had been abandoned; that practically the corporation had ceased to do business; and that the stock was worthless. But the recital in the opinion very clearly indicates that not a single fact ever came to the knowledge of the plaintiff which would apprise him of the true situation, or that the stock was not as represented, except that the plaintiff stated that he heard rumors to the effect that the affairs of the corporation were not in a satisfactory condition, and that thereupon he immediately went to the defendant, the president of the concern, informed him of what he had heard, and asked for an explanation, and that he was assured that the rumors were unfounded, that the corporation was all right and the stock as represented. The plaintiff in that case knew nothing about how the business was being conducted, the extent or character of its property. He had seen nothing. There was nothing to be seen in Syracuse, where he resided. So far as appearances went, the business was being conducted during the years after he purchased his stock precisely as it was at the time of such purchase. If in that case the plaintiff had learned that within four months after the representations were made a receiver of the corporation had been appointed, that it was insolvent, had stopped doing business, did not own the "Shaffer Farm," and had waited eight years with knowledge of those facts without making any investigation as to the cause—we find nothing in the decision to indicate that the court would have held that the cause of action was not barred by the statute of limitations. Indeed, such holding would have been in direct conflict with the rule enunciated in that case above quoted.

In the case at bar the facts which concededly came to plaintiff's knowledge were such as practically demonstrated to a certainty that the representations which he alleges induced him to purchase the stock in question were false when made. Stock of a manufacturing corporation which is insolvent, and for that reason goes into the hands of a receiver in November, is not ordinarily worth $188 per share in July previous. A concern of that character which is doing a large and lucrative business in July does not ordinarily stop business because of its insolvency four months later. It is very extraordinary that a corporation which had a net surplus of $52,000 in July and assets aggregating in value $287,000 should in March following have less than $100,000 of assets and an indebtedness of $194,000. The fact of the receivership in November, which indicated insolvency and that the stock was then valueless, and the fact that at the sale in March the property brought less than $100,000, when it had been represented to the plaintiff as worth $287,000 in July, were all facts which, under the rule adverted to, put the plaintiff upon his inquiry, and such as to call upon him to investigate, to ascertain what the real status of the corporation was

in July, when, as he alleges, he was induced by false representations as to its value to take the stock in question. The slighest investigation made by the plaintiff would have disclosed the true facts in November, 1893, or at least in March, 1894, quite as fully as any examination which he made or could have made subsequently and prior to 1902, when this action was commenced. Indeed, if the facts which came to the knowledge of the plaintiff prior to April, 1894, were not such as to indicate to him that the representations claimed to have been made to him were false at the time they were made, we can hardly conceive of any way such fact. could have been indicated to the plaintiff unless the defendants had gone to him and confessed their alleged wrongdoing. We conclude that the evidence contained in the record now before us establishes as matter of law that plaintiff's alleged cause of action was barred by the statute of limitations before this suit was commenced, and for that reason defendants' motion for a nonsuit should have been granted.

We deem it unnecessary to consider any of the other questions raised by this appeal.

Judgment and order reversed, and new trial granted, with costs to appellants to abide event, upon questions of law and fact. All concur, except KRUSE, J., who dissents.