[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: RECEIVER'S MOTIONS FOR ADVICE DATED JUNE 9AND JUNE 13, 1995
At the court's insistence an evidentiary hearing was held concerning the receiver's motions, at which hearing the defendant Joel Schiavone testified. The principal reason for Mr. Schiavone's testimony was that in the motion dated June 13, 1995, the receiver represented that certain proposals had been received from the defendant Connecticut Limousine Service, Inc., a corporation in which Mr. Schiavone is the controlling shareholder. The facts set forth below were established from the voluminous record in the case, the documents that were introduced as exhibits, as well as Mr. Schiavone's testimony and from inferences that were properly drawn from the above.
 I.
The receiver's motions involve properties in New Haven and Danbury for which judgments of foreclosure were rendered by Judge Hodgson in May, 1995. The judgments are now on appeal. Attorney Kevin J. Kopetz was appointed as receiver of rents on November 10, 1994 by Judge DeMayo.
In the motion dated June 9, 1995, the receiver seeks the advice of the court on the following issues pertaining to both the CT Page 9268 New Haven and Danbury properties:
 1. Whether the receiver, under the terms of the order dated November 10, 1994, has the authority to disaffirm any lease or lease modification concerning the premises located in New Haven and Danbury?
 2. Whether the court should grant such authority to the receiver if the prior order does not provide for the receiver to disaffirm any lease or lease modification?
 3. If the receiver has or is granted the authority to disaffirm any lease or lease modification, whether the receiver should disaffirm the Lease Modification Agreements dated September 28, 1994 between [the defendant] Schiavone Realty Development Corporation and [the defendant] Connecticut Limousine Service, Inc.?
 4. If the receiver should disaffirm the aforementioned Lease Modification Agreements and does not receive rental payments in accordance with the terms of the original leases, whether the receiver should bring an action to collect rent against the lessee or sublessee or whether he should commence summary process actions against the lessee or sublessee thereby terminating the leases?
The receiver's motion dated June 13, 1995, concerns only the Danbury property and asks whether he should enter into an agreement with (Connecticut Limousine Service, Inc. for the operation of a truck stop. A former lessee or sublessee, Secondi's Colonial Truck Stop, Inc., operated a truck stop on a portion of the premises until November 30, 1994. The receiver's negotiations with Secondi for a new lease have been unproductive. The defendant Connecticut Limousine Service, Inc. has proposed that it operate the truck stop that is admittedly a nonconforming use and conduct environmental analyses of the premises on the following terms: It would install two 2,000 gallon diesel tanks, one for trucks and one for its own vehicles; it would staff the facility 24 hours per day and regulate occupancy; it would pursue prior tenants to obtain funds to remedy any environmental problems existing at the site and requests that the receiver contribute any net rental proceeds to this effort; it would keep any and all proceeds from the sale of fuel.
Judge DeMayo's order of November 10, 1994 authorized the receiver, inter alia, to take all actions necessary to collect the CT Page 9269 rents and profits generated by the properties during the pendency of the foreclosure suit, to take all actions necessary to enforce the collection of rentals or reasonable use and occupancy payments from tenants including eviction and/or collection actions; and to extend or modify present leases or to enter into new leases.
The foreclosure suit which was returned to court on February 22, 1994 involved primarily a mortgage dated February 21, 1986 of the New Haven and Danbury properties granted by the defendant Schiavone Realty Development Corporation to the Union Trust Company.[1] Paragraph (E) of the granting clause of said mortgage states:
 Together with all rents, royalties, issues, profits, revenues, income and other benefits to which Mortgagor may now or hereafter be entitled from the property . . . to be applied against the indebtedness and other sums secured hereby; provided, however, that permission is hereby given to Mortgagor, so long as no Event of Default has occurred hereunder, to collect and use such rents, royalties, issues, profits, revenues, and other benefits as they become due and payable, but not in advance thereof. Mortgagee shall be entitled, at its option upon the occurrence of an Event of Default . . . to all rents, royalties, issues, profits, revenues, income and other benefits from [the properties] . . . whether or not Mortgagee takes possession. . . . Upon the occurrence of an Event of Default, the permission hereby given to Mortgagor to collect such rents, royalties, issues, profits, revenues, income and other benefits from the proper[ties] . . . shall terminate.
 The foregoing provisions hereof shall constitute an absolute and present assignment of the rents, royalties, issue, profits, revenues, income and other benefits from the proper[ties] . . . subject, however, to the conditional permission given to Mortgagor to collect and use such rents, royalties, issues, profits, revenues, income and other benefits as herein provided; and the existence or exercise of such right: of Mortgagor shall not operate to subordinate this assignment to any subsequent assignment, in whole or in part, by Mortgagor, and any such subsequent assignment by Mortgagor shall be subject to the rights of Mortgagee hereunder. CT Page 9270
Paragraph (F) of the same granting clause provides:
 Together with all right, title and interest of the Mortgagor in and to any of (sic) all leases, subleases and occupancy or similar agreement (collectively "leases") now or hereafter on or affecting the proper[ties] . . . together with all security therefore and all moneys payable thereunder . . . subject, however to the conditional permission hereinabove given to Mortgagor to collect the rents, income and other benefits arising under any such lease.
When the mortgage was executed, a lease already existed on the New Haven property between the defendant Schiavone Realty Development Corporation as lessor and the defendant Connecticut Limousine Service, Inc. as lessee. The term of the lease is from May 1, 1979 until August 21, 2004. Rent from May 1 until August 31, 1979 was $3,457.67 per month. From September 1, 1979 until August 31, 1974, the rent increased to $29,811.83 per month, for an annual total of $357,742.00.
A somewhat similar situation was present in Danbury where, in a lease signed on November 16, 1984, the same two parties were lessor and lessee for a five-year term and three additional five-year extensions. The monthly rent for the Danbury property is specified in the lease to be (a) an amount equal to all interest accrued on a note given by the lessor to Richard Sporck in the face amount of $2,250,000.00, which note incidentally is secured by a first mortgage on the Danbury premises; and (b) an amount equal to 1.67% of the lessor's Equity Investment in the premises as of the last day of the calendar month immediately preceding the date of such monthly installment of rent. Lessor's "Equity Investment" is defined by the lease to mean the amount which constitutes the lessor's fixed asset base minus the outstanding debt to Richard Sporck. In addition, the Danbury lease required the lessee to pay all taxes and assessments.
On September 28, 1994, well after the foreclosure suit was instituted, the defendant Schiavone Realty Development Corporation, as lessor, and the defendant Connecticut Limousine Service, Inc. as lessee, executed modification agreements that changed the lessee's rental obligations for the New Haven and Danbury properties. The New Haven agreement deleted § 4(a) of the original lease, wherein the term "rent" was defined, and substituted the following: CT Page 9271
 Tenant shall pay as annual base rental during the term hereof prior to the date the same becomes due and payable, all real estate and personal property taxes, levies, insurance, sewer and water charges, duties and charges of any kind and nature whatsoever as shall be levied, imposed or assessed together with all operating expenses in connection with the Premises directly to the taxing or appropriate authority and/or entities entitled to receive same and shall promptly deliver copies of receipted bills or other evidence satisfactory to Landlord showing such payment in accordance with the foregoing.
The Danbury agreement eliminated the definition of rent in § 5 of its lease and with the exception of using the term "basic rent" instead of base rental, its terms paralleled those of the New Haven agreement. In each agreement, the defendant Joel Schiavone signed as president or vice-president of both the lessor and lessee corporations.
The modifications executed on September 28, 1994 made a substantial reduction in the rental obligations of Connecticut Limousine Service, Inc. The defendant Joel Schiavone estimated that its monthly payment on the New Haven lease is now between $8,000.00 and $12,000.00 and that a similar amount is being paid in Danbury in addition to interest on the Sporck mortgage. Joel Schiavone attempted to justify the modifications by stating that reductions in rent between his related corporations had occurred before and that Connecticut Limousine Service, Inc., at present his only viable enterprise, could not afford to pay more.
Only one previous modification in writing had been made to both leases. On June 30, 1992, with the plaintiff's approval, the terms of both leases were extended until May 1, 2007. The plaintiff, however, was ignorant, until after the receiver was appointed, of the modifications of September 28, 1994, pursuant to which Connecticut Limousine Service, Inc. has stopped paying rent and instead pays what Joel Schiavone termed "operating expenses". Some of these "operating expenses", e.g., the mortgage given to Richard Sporck by Schiavone Kealty Development Corporation on the Danbury property is being paid by Connecticut Limousine Service, Inc. from revenues derived from terminals other than Danbury.
By reducing the rent payable under the leases and turning such CT Page 9272 rent into direct payments for operating expenses, the defendant Joel Schiavone, acting through his companies, has insured that the plaintiff will not receive any rental money in derogation of the express language of paragraphs (E) and (F) of the mortgage being foreclosed. Schiavone's contention is that what has been done is merely a reflection of economic reality and that it has happened before. He may have forgotten that a default in an obligation under the mortgage transferred control of the rents to the plaintiff, and by Judge DeMayo's order, to the receiver.
Apparently the area of the property in Danbury is larger than is needed by Connecticut Limousine Services, Inc. Secondi operated the truck stop that formerly occupied a portion of the premises. Now the premises cannot be used as a truck stop unless new and above ground tanks are installed. Joel Schiavone testified that the property is unsalable in its present condition but that for a relatively small amount of money the truck stop could be preserved for the plaintiff and an improved area could be provided for Connecticut Limousine Service, Inc. He also intimated that control of Connecticut Limousine Service, Inc. would soon pass to new parties.
 II.
Three of the four requests for advice contained in the receiver's motion of June 9, 1995, can be discussed together. In the court's opinion, Judge DeMayo's order of November 10, 1994 does not authorize the receiver of rents to disaffirm the leases on the New Haven and Danbury properties or the modifications to these leases that were executed on September 28, 1994. Further, as a general rule, a receiver cannot disaffirm leases, such as these, that were entered into prior to the mortgage. G. Osborne, Mortgages (2d ed.) § 152. With respect to the modifications, however, the court views them as junior leases and will supply authority for the receiver to disaffirm. See M. Friedman, RentalsRoulette: The Mortgagee's Rights To Rent Under Connecticut Law andUlsia, 24 Conn. L.R. 1093, 1109 (1992).
When a receiver of rents is appointed to take charge of property in a foreclosure action, he becomes an officer of the court and holds the property as such. His possession is not that of the foreclosing mortgagee. Desiderio v. Iadonisi, 115 Conn. 652,655 (1932); Tucker v. Pace Investment Associates, 2 Conn. L. Rptr. 740,5 C.S.C.R. 986 (1990). The object of appointing a receiver is to secure the property in dispute from waste or loss. Hartford Federal SavingsCT Page 9273 Loan Assn. v. Tucker, 196 Conn. 172, 175 cert. denied 474 U.S. 920,106 S.CT. 250, 88 L.Ed.2d 258 (1985). Obviously the modifications executed on September 28, 1994 should be disaffirmed by the receiver. Through them, Joel Schiavone and his corporations are preferring other creditors to the detriment of the plaintiff. The receiver is appointed on behalf of creditors who have established interests in the properties. Bergen v.Robbins, 109 Conn. 329, 335 (1929).
Moreover, the modifications contradict paragraphs (E) and (F) of the mortgage cited above. These provisions amount to a lien upon the rents in the event of a default in the mortgagor's obligations. It was beyond the power of the lessor and lessee to agree to devote what in effect are pledged rents to other debts.Bank of Manhattan Trust Co. v. 571 Park Avenue Corporation,263 N.Y. 57, 188 N.E.2d 156, 158 (1933); New York City CommunityPreservation Corporation v. Michelin Associates, 115 App.Div. 715,496 N.Y.S.2d 530, 533 (1985). Although no Connecticut case was found that is precisely in point with the New York authorities, the preceding discussion as to preferences among creditors is the court's indication that, in this regard, the jurisprudence of the two states would be the same.
Disaffirmance of the modifications will return the rent situation to what it was before September 28, 1994. Conceivably, a disaffirmance might result in Connecticut Limousine Services, Inc. vacating one or both properties. Until the result of the disaffirmance is known, the court believes that it would be premature to advise the receiver as to whether he should sue for rent or terminate the leases by summary process actions.
 III.
As heretofore mentioned, the court's original intention in scheduling an evidentiary hearing was to allow Joel Schiavone an opportunity to prove his ability to renovate and reinstall the truck stop at the Danbury property. Instead the impression received was that Connecticut Limousine Service, Inc. was not in a position to undertake the task and that control of this corporation would soon pass from Mr. Schiavone to an unnamed party or parties.
Apparently time is not of the essence in any decision concerning the truck stop. In 1989, the zoning enabling statute (§ 8-2) was amended to read "[s]uch regulations shall not provide for the termination of any nonconforming use solely as a result of CT Page 9274 nonuse for a specified period of time without regard to the intent of the property owner to maintain that use." Superior Court decisions supplied by the plaintiff have not, because of the statute, inferred an intent to abandon from nonuse alone.
 IV.
Based on the foregoing, the court advises the receiver as follows:
Re Motion for Advise dated June 9, 1995:
 The modifications to the leases dated September 28, 1994 should be disaffirmed;
 The receiver of rents is hereby authorized to effect such disaffirmances;
 Until the result of the disaffirmances is known, it is premature for the court to advise whether the receiver, should initiate actions to collect rents or actions in summary process.
 Re Motion for Advice dated June 13, 1994:
 The receiver is advised to discontinue negotiations with Connecticut Limousine Service, Inc. regarding the reinstallation of the truck stop.